1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   LILITH GAMES (SHANGHAI) CO.      )   Case No. 15-CV-01267-SC
    LTD.,                            )
10                                   )   ORDER DENYING PLAINTIFF'S
                  Plaintiff,         )   MOTION FOR PRELIMINARY
11                                   )   INJUNCTION
        v.                           )
12                                   )
                                     )
13  UCOOL, INC. AND UCOOL LTD.,      )
                                     )
14                Defendants.        )
                                     )
15  _____)

16

17

18  **I.  INTRODUCTION**

19       Now before the Court is Plaintiff Lilith Games Co.'s

20  ("Lilith") motion for preliminary injunction.  ECF No. 30 ("Mot.").

21  Lilith brings this motion to enjoin Defendants uCool, Inc. and

22  uCool LTD ("uCool") from "any further misappropriation of Lilith's

23  trade secret" and from "reproducing, copying, preparing any

24  derivative works, and/or distributing any of Lilith's registered

25  copyrights . . . which necessarily includes Lilith's code that is

26  now unlawfully contained in uCool's game Heroes Charge . . . ."

27  Mot at 24.

28  ///

The motion is fully briefed,[1] and oral argument was held on September 11, 2015.  Having considered the parties' submissions, argument, and the relevant law, and for the reasons discussed herein, Lilith's motion to preliminarily enjoin uCool is DENIED, and uCool's evidentiary objections are OVERRULED.

**II.   <u>BACKGROUND</u>**

Plaintiff Lilith is a video game developer that released the game <u>Dao Ta Chuan Qi</u> (translated as "<u>Sword and Tower</u>")[2] in China in February 2014.  Lilith holds Chinese copyright registrations in <u>Sword and Tower</u>'s Lua[3] source code and alleges that it owns the copyrights to that code pursuant to Chinese copyright law.  <u>Sword and Tower</u> has enjoyed great commercial success, and as of August 2014, was the leading game in Asia.  Mot. at 5.

Defendant uCool is a video game marketer who allegedly obtained access to Lilith's copyrighted software code for <u>Sword and Tower</u> and used it to create its own game, <u>Heroes Charge</u>, which it published in the United States in August 2014.  ██████████

██████████████████████████████████████████

███████████████████    ██████████

  ████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

---

[1] ECF Nos. 69 ("Opp'n"), 77 ("Reply"), 87-1 ("Surreply").

[2] The game has also been referred to as "<u>Dota Legends</u>".  <u>See, e.g.</u>, ECF No. 43-01 ¶ 2.

[3] Lua is a programming language commonly used to develop video games.

**United States District Court**
For the Northern District of California

▌ **United States District Court**
▌ For the Northern District of California

1 ████████████████████████████████████ ███

2 ████████████████████ ██████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 █████ ███████████

6      Lilith first learned of uCool's allegedly unlawful copying in

7 August 2014, at which point it attempted to resolve the dispute by

8 issuing a take-down notice to Apple.[5]  The parties then exchanged

9 correspondence through the end of November 2014, when those talks

10 stalled without any action from Apple regarding the takedown

11 request.

12      In March 2015, Lilith decided to release Sword and Tower in

13 countries outside of China including the United States, Japan, and

14 certain European countries.  Because of the similarities between

15 the games and because Heroes Charge was already active in many of

16 these countries, many users believed that Sword and Tower had been

17 copied from Heroes Charge and posted comments to that effect on the

18 internet.  See Mot. at 12-13.  Lilith cites these comments as

19 evidence that uCool's alleged copying has created ongoing damage to

20 Lilith's reputation and confusion in the marketplace.  Id.  Lilith

21 also claims that it has been unable to enter into an exclusive

22 distribution agreement in the United States as a result of the

23 presence of Heroes Charge in the US market.  Id.

24      Shortly thereafter on March 18, 2015, Lilith filed this action

25 -- four months after talks with uCool had broken down.  Lilith

26 _____

[4]  See https://www.youtube.com/watch?v=GdGKx_IhVbg

27 [5]  Heroes Charge is sold through the Apple and Android (Google Play)
app stores.

28

3

**United States District Court**
For the Northern District of California

argues that the four month delay was justified because Lilith is a small start-up[6] and was reluctant to become involved in costly litigation until it was necessary.  Filing suit was not necessary until March 2015, according to Lilith, because the harm to Lilith in the form of damage to its reputation and its inability to secure exclusive distribution agreements did not become apparent until March 2015 when Lilith attempted to enter markets where Heroes Charge had already been released.

In its first claim for relief for copyright infringement, Lilith alleges that uCool copied Lilith's copyrighted source code embodied in Sword and Tower and used it to create the source code for Heroes Charge.  Because Sword and Tower is not a United States work as defined in 17 U.S.C. Section 101, Lilith brings its copyright infringement claim under the Berne Convention, an international agreement governing copyright.

In its second claim for relief, Lilith alleges that 240,000 lines of Lua code embodied in Sword and Tower is a trade secret and that uCool knowingly misappropriated that trade secret in violation of California's Uniform Trade Secrets Act (Cal. Civ. Code § 3426, et seq.) when it allegedly used Lilith's code to create Heroes Charge.  In support of its trade secret claim, Lilith has presented evidence of efforts made to maintain the confidentiality of its source code.  For example, Lilith stores the source code on a secure server and limits access only to those employees who need it to perform their duties.  Lilith also encrypts the Sword and Tower

---

[6] It is unclear what Lilith means by "small start-up," particularly given that Lilith owns the most popular game in Asia.

**United States District Court**
For the Northern District of California

1  source code so that it cannot be easily deciphered.  Of the twenty-
2  one employees who have had access to the source code, however, only
3  five signed confidentiality agreements prior to this litigation.

4      Two weeks after filing its complaint, Lilith filed a motion
5  for preliminary injunction.  ECF No. 17.  On April 22, 2015, Lilith
6  withdrew its motion as a result of a dispute with uCool relating to
7  a mutual exchange of source code for analysis but re-filed the
8  motion on May 5, 2015.  On June 4, 2015, the Court granted uCool's
9  motion for an extension of time so that both sides could perform
10  limited discovery prior to the close of briefing on this motion,
11  including a mutual exchange of source code.  ECF No. 48.  In
12  response to Lilith's discovery requests, uCool produced a new
13  version of the Heroes Charge source code that had yet to be
14  released.  This new version was written in a different programming
15  language called C#.  Subsequently, uCool also produced portions of
16  the Lua version of the Heroes Charge source code.  Both parties
17  analyzed the code that was produced and submitted expert
18  declarations as part of their briefing on this motion.  See ECF
19  Nos. 69-17 ("Kitchen Decl."), 74-4 ("Roman Decl."), 109 ("Suppl.
20  Roman Decl.").  In addition to the briefs and supporting papers,
21  the Court heard oral argument on September 11, 2015, at which the
22  parties agreed they could be ready for trial in approximately nine
23  months.

24

25  **III.  <u>LEGAL STANDARD</u>**

26      Before a court can grant preliminary injunctive relief, a
27  plaintiff must first "establish that he is likely to succeed on the
28  merits, that he is likely to suffer irreparable harm in the absence

United States District Court
For the Northern District of California

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (citations omitted).  This is commonly referred to as the "four-factor test." See, e.g., Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009).

Although it was once Ninth Circuit law that a plaintiff in copyright cases was entitled to a presumption of irreparable harm on a showing of likelihood of success on the merits, the Supreme Court ended that practice in eBay Inc. v. MercExchange, L.L.C.. See 547 U.S. 388, 393-94 (2006) ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").  Two years later in Winter v. Natural Res. Def. Council, Inc., the Court further held that the Ninth Circuit's rule allowing for a mere "possibility" of irreparable harm was insufficient.  See 555 U.S. 7, 20 (2008).  Thus, as the Ninth Circuit has since clarified, "even in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief." Flexible Lifeline Sys. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011) (emphasis added). Moreover, because a preliminary injunction "is an extraordinary remedy never awarded as of right," a district court may decide to deny a preliminary injunction pursuant to its equitable discretion even where success on the merits is likely.  Winter, 555 U.S. at 24; see 17 U.S.C. § 502(a) (providing that a court "may . . . grant temporary and final injunctions on such terms as it may deem

reasonable to prevent or restrain infringement of a copyright")
(emphasis added); eBay Inc., 547 U.S. at 391 (2006); Perfect 10,
Inc. v. Google, Inc., 653 F.3d 976, 980 (9th Cir. 2011).

Although eBay and Winters require district courts to consider
each of the factors of the four-factor test before granting a
preliminary injunction, the Ninth Circuit has held that the factors
may be balanced such that "a stronger showing of one element may
offset a weaker showing of another." Alliance for the Wild Rockies
v. Cottrell, 632 F.3d 1127, 1131 (9th Cir.2011).

In denying a preliminary injunction, however, a court need not
make findings on all four factors if fewer factors are dispositive
of the issue. See Winter, 555 U.S. at 23-24 ("A proper
consideration of [the balance of hardships and the effect of the
preliminary injunction on the public interest] alone requires
denial of the requested injunctive relief. For the same reason, we
do not address the lower courts' holding that plaintiffs have also
established a likelihood of success on the merits."); Global
Horizons, Inc. v. United States Dep't of Labor, 510 F.3d 1054, 1058
(9th Cir. 2007) ("Once a court determines a complete lack of
probability of success or serious questions going to the merits,
its analysis may end, and no further findings [on irreparable harm,
balance of hardships, or public interest] are necessary.").

## IV. **DISCUSSION**

### A. **Mootness**

In its opposition, uCool argues that Lilith's motion is moot
because uCool recently completed a rewrite of the Heroes Charge
source code using a different programming language. This new

**United States District Court**
For the Northern District of California

version of <u>Heroes Charge</u> uses the programming language C# instead of Lua, the language used by Lilith to write the source code for <u>Sword and Tower</u>.  Lilith's expert, however, presented evidence in his declaration showing that the source code is still substantially similar notwithstanding the rewrite, including significant portions that were "literally copied and are identical" or "copied and then translated, modified, reordered, or otherwise obscured in such a way that common code comparison programs would not be able to detect the similarities." Roman Decl. ¶ 43.  uCool counters that (1) Lilith's analysis only specifically pointed to 19 lines of code, (2) C# is so different from Lua "that the new code cannot have been copied from Lilith's code but must have been built from scratch", and (3) Lilith's analysis focused on external files and abstract elements that are not related to the code at issue. Surreply at 4.

The C# version of <u>Heroes Charge</u> was being used by less than 1% of users as of the date of the hearing on this motion.  Over 99% of users continue to use a Lua version of the game, which the parties agree contains "significant similarities" to the Lua code embodied in <u>Sword and Tower</u>.  Kitchen Decl. ¶ 135.  The parties' dispute over whether the C# version of <u>Heroes Charge</u> is substantially similar to the Lua version of <u>Sword and Tower</u>, therefore, is largely academic.  Furthermore, as explained in subsequent sections, insofar as the C# version of <u>Heroes Charge</u> merely translated Lilith's code from Lua to C#, it would still infringe on Lilith's copyright in the same way that a French translation of an English novel would infringe on the latter's copyright.

Accordingly, the Court finds that Lilith's motion is not moot.

**United States District Court**
For the Northern District of California

### B.   <u>Likelihood of Success on the Merits</u>

Lilith pleads two claims in its Second Amended Complaint: copyright infringement and trade secret misappropriation.  <u>See</u> ECF No. 83 ("SAC").  While Lilith must set forth evidence to support a likelihood of success on at least one of its claims, it need not demonstrate an absolute certainty of success.  <u>See</u> <u>Abdul Wali v.</u> <u>Coughlin</u>, 754 F.2d 1015, 1024-1025 (2d Cir. 1985); <u>Netlist Inc. v.</u> <u>Diablo Techs., Inc.</u>, No. 13-cv-05962, 2015 U.S. Dist. LEXIS 3285, at *19-20 (N.D. Cal. Jan. 12, 2015).

### 1.   <u>Copyright Infringement</u>

In order to demonstrate a likelihood of success on its copyright claim, Lilith must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work.  <u>Feist Publications v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).

### a.   <u>Ownership</u>

Because Lilith claims it owns a Chinese copyright to the source code in <u>Sword and Tower</u>, ownership is a question of Chinese law.  <u>See</u> <u>Lahiri v. Universal Music & Video Distribution, Inc.</u>, 513 F. Supp. 2d 1172, 1174 n.4 (C.D. Cal. 2007).

Article 59 from the People's Republic of China Copyright Law ("PRCCL") provides that the State Council is responsible for setting measures for the protection of computer software.  ECF No. 69-2 ("PRCCL Amendments") at 25-26 ("Article 59:  Measures for the protection of computer software and of the right of communication through information network shall be formulated <u>separately</u> by the State Council.") (emphasis added).  Pursuant to that mandate, the
///

**United States District Court**
For the Northern District of California

State Council has issued Regulations on Computer Software ("Software Regulations").  ECF No. 77-9 ("Chu Decl.") ¶ 9.

Article 7 of the Software Regulations states that registration of a copyright is <u>prima facie</u> evidence of copyright ownership.  <u>Id.</u> ¶¶ 10-12.  The Software Regulations also state that the "copyright in a piece of software belongs to its developer."  <u>Id.</u> ¶ 10.  If an organization's "name is mentioned in connection with a piece of software," the organization, "shall, in the absence of proof to the contrary, be its developer."  <u>Id.</u>  In addition, Article 13 provides that, if an employee develops a piece of software in the course of his or her employment, the employer is the owner if just one of the following conditions are met:

> (1) the software is developed based on the development objective explicitly designated in the line of his service duty;
>
> (2) the software is a foreseeable or natural result of his work activities in the line of his service duty; or
>
> (3) the software is developed mainly with the material and technical resources of the legal entity or other organization, such as funds, special equipment or unpublished special information, and the legal entity or other organization assumes the responsibility thereof.

<u>Id.</u> ¶ 13.

Here, Lilith owns valid Chinese copyright registrations and therefore has provided <u>prima facie</u> evidence of copyright ownership under Chinese law.  ECF Nos. 17-1 ¶ 4, 17-2.  In addition, it is undisputed that Lilith is the entity that filed for and obtained the copyright registrations and that these registrations expressly list Lilith as the copyright owner.  Thus, Lilith is the developer of the <u>Sword and Tower</u> source code and the copyright for <u>Sword and Tower</u> consequently belongs to Lilith.  Finally, even though the

**United States District Court**
For the Northern District of California

source code for <u>Sword and Tower</u> was developed by Lilith's employees, Lilith retains ownership of the copyright even if it did not secure assignments from those employees because it meets all of the conditions set out in Article 13 of the Software Regulations.

For these reasons, the Court finds that Lilith is likely to prove copyright ownership at trial.

### b.   <u>Copying</u>

Copying can be established by either presenting direct evidence of copying, or absent that, circumstantial evidence that the infringer (1) had access to the copyrighted work, and (2) that the parties' works are substantially similar.  <u>L.A. Printex Indus. Inc. v. Aeropostale, Inc.</u>, 676 F.3d 841, 846 (9th Cir. 2012).

### i.   <u>Access</u>

"Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendants access to that work . . . , or (2) the plaintiff's work has been widely disseminated." <u>Three Boys Music Corp. v. Bolton</u>, 212 F.3d 477, 482 (9th Cir. 2000).

uCool's access is demonstrated by the fact that Lilith's copyright declaration can be found in at least one version of <u>Heroes Charge</u>.  <u>See</u> ECF No. 19 ("Ray Decl.") (providing a video recording of the copyright declaration appearing in <u>Heroes Charge</u>). Lilith also argues that uCool had access because <u>Sword and Tower</u> has been widely disseminated since its release in February 2014. It is unclear, however, how this latter argument is relevant unless the source code is included anytime a user downloads the game from the app store.  It is the Court's understanding that the source

**United States District Court**
For the Northern District of California

1  code is not disseminated with the game itself, and therefore the

2  fact that <u>Sword and Tower</u> has been "downloaded over 29 million

3  times through one distribution channel alone" does not help to

4  establish access.  Mot. at 16.  Regardless, based on the presence

5  of Lilith's copyright declaration alone, the Court concludes that

6  Lilith is likely to satisfy the element of access at trial.

7  **ii.   <u>Substantial Similarity</u>**

8  Computer programs, including video games, are protected under

9  copyright law as literary works containing both literal and non-

10 literal elements.[7]  See <u>Miller v. Facebook, Inc.</u>, No. C 10-00264

11 WHA, 2010 WL 2198204, at *4 (N.D. Cal. May 28, 2010).  Just as the

12 literal elements of a book are the words themselves, the literal

13 elements of a computer program are the alphanumeric instructions

14 written by a programmer -- <u>i.e.</u>, the source code.  See <u>Johnson</u>

15 <u>Controls, Inc. v. Phoenix Control Sys., Inc.</u>, 886 F.2d 1173, 1175

16 (9th Cir. 1989).  This can be contrasted with the non-literal

17 elements, expressive aspects of the source code steps removed from

18 the alphanumeric instructions themselves.  In the case of a book,

19 non-literal elements include the characters, setting, and plot

20 created by the words on the page.  Similarly, the non-literal

21 elements of a computer program include expressive elements created

22

23 [7] The distinction between literal and non-literal elements is
separate from the distinction between literal and non-literal

24 copying.  <u>See</u> <u>Altai</u>, 982 F.2d at 701-02.  "Literal" copying is
verbatim copying of original expression.  "Non-literal" copying is

25 "paraphrased or loosely paraphrased rather than word for word."
<u>Lotus Dev. Corp. v. Borland Int'l</u>, 49 F.3d 807, 814 (1st Cir.

26 1995).  Both types of copying are unlawful, and both are at issue
in this case.  The Court uses the word "literal" in this order,

27 however, to distinguish the types of protectable elements, not as a
synonym for verbatim copying.

28

by the source code: the code's order, sequence, and structure; the user interface (including artwork and other visual elements embodied in the code); and -- in the case of sophisticated video games -- the plot, characters, and setting of the game.  See id. at 1175.  It is well established that copyright protection for a computer program extends to both literal and non-literal elements of a computer program.  See id.; Computer Associates Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 702 (2d Cir. 1992).  Thus, the Court will examine each in turn.

### 1.   Literal Elements

Substantial similarity in the literal elements of a computer program can be demonstrated either by showing verbatim (or near verbatim) copying of the source code or that the "fundamental essence" of the code was duplicated.  See 4-13 Nimmer on Copyright § 13.03.  Returning to the book analogy, the fundamental essence of a book passage is duplicated when an infringer paraphrases the passage or simply translates it into a different language.  Similarly, copying will be found where source code is translated from one programming language to another or where insignificant changes are made, such as replacing certain terms, reordering lines of code, or adding or removing comments.[8]  See also Roman Decl. ¶ 53 (listing common methods used to obfuscate copying).

If at least some amount of copying can be shown, whether the works are substantially similar turns on whether the copying is

---

[8] Similarly, such minor variations violate a copyright holder's exclusive right to create derivative works.  See 1-3 Nimmer on Copyright § 3.01 ("a work will be considered a derivative work only if it would be considered an infringing work . . . .").

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    sufficiently extensive to constitute a substantial portion of the
2    plaintiff's work.  4-13 Nimmer on Copyright § 13.03.  "The
3    quantitative relation of the similar material to the total material
4    contained in plaintiff's work is certainly of importance.  However,
5    even if the similar material is quantitatively small, if it is
6    qualitatively important, the trier of fact may properly find
7    substantial similarity."  Id.

8        Lilith embedded within the Sword and Tower source code a
9    copyright declaration that, if triggered, results in a pop-up
10   window that reads "LILITH GAMES ©."  Lilith provided the Court with
11   convincing evidence that at least one version of Heroes Charge
12   contains the code that triggers this copyright declaration.  See
13   Ray Decl..  Although uCool claims it was unable to replicate the
14   pop-up, it conspicuously fails to identify the version of Heroes
15   Charge used in those attempts -- that is, whether it used the same
16   version used by Lilith (Version 1.8.1) or whether it used later
17   versions that uCool had changed subsequent to the start of this
18   litigation to prevent the pop-up from appearing.  uCool also
19   refused to provide this information in discovery.  ECF No. 77-1 ¶¶
20   3, 9, 11.

21       The appearance of Lilith's copyright declaration in uCool's
22   game is sufficient to establish more than a de minimis level of
23   copying.  See Brocade Commc'ns Sys v. A10 Networks, Inc., No. 10-
24   3428 PSG, 2013 U.S. Dist. LEXIS 8113, at *34-36 (N.D. Cal. Jan. 10,
25   2013) (holding that the copying of 145 lines of copyrighted code
26   provided substantial evidence that defendants' actions exceeded
27   merely de minimis copying of code).  If that were not enough,
28   Lilith presented other evidence of widespread duplication.  For

14

example, Lilith provided the Court with side-by-side comparisons of the source code in Sword and Tower as compared to the C# version of Heroes Charge.  The comparisons show that much of the code in Heroes Charge is identical, merely translated into C#, or insignificantly modified.  See, e.g., Roman Decl. ¶¶ 70, 71, 74, 79, 87, 88, 97-99.  Lilith also provided the Court with comparisons of the source code in Sword and Tower as compared to a Lua version of Heroes Charge.  The comparison showed again that much of the code is identical.  See, e.g., Suppl. Roman Decl. ¶¶ 16-20, 22.

Considering the literal elements of the source code alone, the Court finds that a finder of fact is likely to conclude that the source code for Heroes Charge is substantially similar to the source code for Sword and Tower.  Nevertheless, the Court also examines the non-literal elements of the source code in the following section.

### 2.   Non-Literal Elements

Whether the non-literal elements of a program "are protected depends on whether, on the particular facts of each case, the component in question qualifies as an expression of an idea, or an idea itself."  Id.  The Ninth Circuit has endorsed an "abstraction-filtration-comparison" test formulated by the Second Circuit and expressly adopted by several other circuits.  Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1525 (9th Cir. 1992) ("In our view, in light of the essentially utilitarian nature of computer programs, the Second Circuit's approach is an appropriate one.").  As the Second Circuit explains, this test has three steps.  In the abstraction step, the court identifies which aspects of the program constitute its expression and which are the ideas.  In the

**United States District Court**
For the Northern District of California

1  filtration step, the court "sift[s] out all non-protectable

2  material," including ideas and "expression that is necessarily

3  incidental to those ideas." Id. at 706.  In the final step, the

4  court compares the remaining creative expression with the allegedly

5  infringing program.

6      In the expert declaration of Kendyl Roman, Lilith provided an

7  analysis of the non-literal elements of the Lua source code from

8  Sword and Tower and the C# source code from Heroes Charge.  Mr.

9  Roman states that he applied the abstraction-filtration-comparison

10  test in his analysis.  Mr. Roman, however, failed to document his

11  application of each step, and it is not entirely clear as a result

12  whether all of the similarities to which he points are protected by

13  copyright.  Nevertheless, it is clear that there are substantial

14  similarities across a significant number of copyrighted elements.

15  For example, at the component level of abstraction, similar groups

16  of files are found in similar directories, such as the files for

17  the user interface.  Roman Decl. ¶ 67.  In addition, at the flow

18  chart level of abstraction, the sequences show that the same

19  algorithm is being implemented.  Id. ¶ 80.  Further, at the

20  parameter list level of abstraction, the function calls show

21  identical and equivalent parameter lists.  Id. ¶ 81.  Finally, at

22  the function level of abstraction, many of the functions are

23  identical and show up in the same order inside the file.  Id. ¶ 82.

24      Lilith also presents evidence of significant similarities

25  between the Lua versions of both games.  See generally Suppl. Roman

26  Decl..  Although uCool attempts to dispute some aspects of Lilith's

27  analysis, uCool's own expert admitted in his declaration that

28  "there are significant similarities between the Lua source code for

16

1  Heroes Charge and the Lua source code for [Sword and Tower],

2  including similarities in [non-literal elements such as] structure,

3  function calls, and parameter values."  Kitchen Decl. ¶ 135.

4      After considering expert reports from both sides, the Court

5  finds that a finder of fact is likely to conclude that the non-

6  literal elements of both the Lua and C# versions of Heroes Charge

7  are substantially similar to the non-literal elements of Sword and

8  Tower.

### 3.   User Interface

10     The forgoing analysis is sufficient to establish that Lilith

11 is likely to succeed in showing substantial similarity at trial.

12 This includes evidence that uCool copied the source code itself

13 (verbatim, with slight modifications, or by translating it from Lua

14 to C#) as well as non-literal elements of the source code,

15 including its structure, sequence, and organization.  The question

16 remains, however, whether the Court should also take into

17 consideration the visual elements of the games as they appear on

18 the computer screen as well as other aspects perceived by users

19 (collectively "the user interface"[9]).

20     Both parties assert that Lilith's claims "present a relatively

21 straightforward question of whether uCool copied Lilith's protected

22 source code -- a question that will be largely resolved by

23 comparing the alphanumeric instructions read by a computer . . . ."

24 ECF No. 61 at 1-2, Opp'n at 1.  Lilith also argues, however, that

26 [9] "The user interface, also called the 'look and feel' of the
27 program, is generally the design of the video screen and the manner
   in which information is presented to the user.  Johnson Controls,
   Inc., 886 F.2d at 1176 n.3.

28

**United States District Court**
For the Northern District of California

the similarities in the games' user interfaces are relevant because they "constitute circumstantial evidence of uCool's unlawful copying [of the <u>Sword and Tower</u> source code]" (Reply at 8).  In addition, Lilith points in its Second Amended Complaint ("SAC") to the user interface as one of the expressive elements of its source code protected by its copyright.  <u>See</u> SAC ¶ 13 (providing various screenshots comparing the visual elements of the two games). uCool, however, contends that the Court should strike these and similar references in Lilith's filings because Lilith "waived any argument that it is asserting a copyright in the [user interface]" and admitted in its opposition to the motion to intervene "that comparing screen images is irrelevant to this lawsuit."  Opp'n at 23.  For the reasons set forth below, Lilith's objection is OVERRULED and its request to strike is DENIED.

Lilith did not waive its ability to point to the visual similarities between the games.  It included in its SAC screenshots comparing the user interfaces.  Further, the Court agrees with Lilith that it would not have been relevant to this case to compare the <u>intervenors'</u> images with the parties' images.[10]  After all, whether the parties' images infringed the intervenors' copyrighted images is immaterial to whether uCool infringed Lilith's copyrighted source code.  The same cannot be said, however, about

---

[10] On August 17, 2015, the Court denied a motion to intervene, in part, because the intervenors' claims focused entirely on the visual similarities between their games and certain characters in <u>Heroes Charge</u> and <u>Sword and Tower</u>.  ECF No. 93.  In its order, the Court agreed with Lilith and uCool that intervention would be inappropriate because the intervenors' claims had nothing to do with Lilith's source code.  The order, however, was not intended to imply that the visual similarities between <u>Heroes Charge</u> and <u>Sword and Tower</u> are irrelevant to this case.

United States District Court
For the Northern District of California

the similarities between the parties' images.

A video game copyright protects all of the copyrightable elements of that game.  While it is true that the copyright laws separately protect the user interface of a computer game as an independent audiovisual work (see Data E. USA, Inc. v. Epyx, Inc., 862 F.2d 204, 206 (9th Cir. 1988)), courts have also held that a user interface is a non-literal element of the program's source code (see Johnson Controls, Inc., 886 F.2d at 1175; Lotus Dev. Corp. v. Paperback Software Int'l, 740 F. Supp. 37, 63-65 (D. Mass. 1990); see also Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 283 (S.D.N.Y. 2001) (connecting the visual output of a computer program with the underlying program itself)).  Consistent with that view, the Copyright Office issues a single copyright registration that protects all of a game's copyrightable elements, regardless of whether the game is registered as a literary or audiovisual work. See 17 U.S.C. § 102(b); 37 C.F.R. § 202.1.  Thus, although Lilith's claim is focused on its source code, that claim includes all of the non-literal expressive elements of that code as well, including the user interface.

uCool argues that copyright protection as it relates to a video game's source code should be considered separately from a game's audiovisual aspects because, in part, there are many ways one can write source code to achieve the same audiovisual output. For that reason, the argument goes, similarities as to the audiovisual outputs are not probative of whether the copyright in the source code was violated.

While it is true that one cannot conclude based on a game's visual similarities that the literal alphanumeric instructions

**United States District Court**
For the Northern District of California

1  written by the programmer are the same, that is not the point.
2  Indeed, there are many different ways to write a book to achieve
3  the same non-literal expressive elements of plot, setting,
4  character, and so forth, whether through the selection of different
5  words or the use of different languages.  Insofar as the non-
6  literal expressive elements of that book are substantially the same
7  as another copyrighted book, however, the former has infringed on
8  the latter regardless of whether the words themselves have been
9  copied.  Likewise, infringement will be found where the non-literal
10 elements expressed by a game's source code -- including the user
11 interface -- are substantially similar to another game, even though
12 there are many different ways to write the source code to create
13 those non-literal elements.  For that reason, the Court rejects
14 uCool's attempts to limit the analysis merely to whether the
15 alphanumeric code itself was copied verbatim; copyright analysis is
16 not so simplistic.

17      Accordingly, the Court finds that the user interface of <u>Sword
18 and Tower</u> is one of the various non-literal elements of the source
19 code protected by Lilith's copyright, including the visual elements
20 as depicted through screenshots in Lilith's complaint, motion, and
21 supporting papers.  uCool's objection is therefore OVERRULED.

22      Given the significant evidence of copying in the previous two
23 sections, the Court need not engage in a full analysis of whether
24 the protected elements of the games' user interfaces are
25 substantially similar.  It is clear, however, that the striking
26 similarities between the games' protected elements such as the
27 visual appearance of characters and settings further support the
28 Court's conclusion that Lilith is likely to prove substantial

**United States District Court**
For the Northern District of California

similarity at trial.  Indeed, the evidence shows that the games are almost identical from the user's standpoint, with only minor modifications.  <u>See</u> Mot. 7-10; ECF No. 30-18 ("Yang Decl.") ¶¶ 3-13, Ex. A.

For the forgoing reasons, the Court finds that Lilith is likely to succeed on its copyright infringement claim.

### 2. <u>Trade Secret Misappropriation</u>

In order to demonstrate a likelihood of success on its trade secret claim under California's Uniform Trade Secrets Act ("CUTSA"), Lilith must show (1) the existence of a trade secret, and (2) misappropriation of the trade secret.  <u>AccuImage Diagnostics Corp. v. Terarecon, Inc.</u>, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing Cal. Civ. Code § 3426.1(b)).

### a. <u>Existence of a Trade Secret</u>

Under California law, a trade secret is defined as something that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Cal. Civil Code § 34.26.1(b).

Here, it cannot be questioned that Lilith derives independent economic value from <u>Sword and Tower</u> and by extension its protected source code.  What is at issue is whether Lilith made reasonable efforts to maintain the source code for <u>Sword and Tower</u> as a secret.

Reasonable efforts to maintain the secrecy of certain information include limiting access to the information, advising

**United States District Court**
For the Northern District of California

employees of the existence of a trade secret, requiring employees to sign nondisclosure agreements, and keeping secret documents under lock.   See Religious Technology Center v. Netcom On-Line Communication Services, Inc., 923 F. Supp. 1231, 1253 (N.D. Cal. 1995).   "[F]ailure to employ the fullest range of protective techniques will not terminate the secrecy provided that the techniques employed were, in and of themselves, reasonably prudent."   1-1 Milgrim on Trade Secrets § 1.04.

The Court finds that Lilith's efforts to maintain the confidentially of its source code, while not as rigorous as they could have been, were sufficiently reasonable to maintain the code as a trade secret.   Lilith keeps its source code on a secure server and limits access only to those employees who need it to perform their duties.   Lilith also encrypts the Sword and Tower source code so that it cannot be easily deciphered.   Although Lilith failed to secure confidentiality agreements from all of the employees that had access to the code, Lilith has presented evidence to show that these employees understood Lilith's code to be confidential business information.   Further, there is no evidence to suggest that any of these employees disclosed the code to a third party.

### b.   Misappropriation

uCool does not address the misappropriation element in its opposition or surreply.   Regardless, the Court takes it up here and finds that Lilith is likely to succeed on this element as well.

Misappropriation can be established by either acquisition or disclosure/use:

(b) Misappropriation means:

22

(1) Acquisition of a trade secret of another without express or implied consent by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (A) Used improper means to acquire knowledge of the trade secret; or

    (B) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

        (i) derived from or through a person who had utilized improper means to acquire it;

        (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Cal. Civ. Code § 3426.1.  As explained below, Lilith has shown misappropriation by both acquisition and use.

Lilith provided evidence showing that uCool acquired and used the source code embodied in Sword and Tower without Lilith's consent.  As detailed in the Court's copyright analysis above, Lilith has provided significant evidence showing that uCool copied its source code.  This includes convincing evidence that at least one version of Heroes Charge (Version 1.8.1) included a portion of Lilith's code that triggers Lilith's copyright notice.  Insofar as there was copying, there is no dispute that it was done without Lilith's consent.

Lilith also provided evidence showing that uCool knew or had reason to know that the source code was acquired by improper means

United States District Court
For the Northern District of California

or in breach of a duty to maintain its secrecy.  "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Cal. Civ. Code § 3426.1. uCool would have known, or should have known, that the source code that it copied in order to create <u>Heroes Charge</u> belonged to Lilith given that the user interface is almost identical to <u>Sword and Tower</u>, with which uCool would have been familiar given <u>Sword and Tower</u>'s significant success in the video game market.  Further, it is well known that source code is the <u>confidential</u> property of a game's owner.  In that context, it is likely that a trier of fact will infer that uCool knew the code was acquired through improper means or in breach of a duty because Lilith would not have given its competitor, uCool, free access to its code.

For these reasons, the Court finds that Lilith is likely to succeed on its trade secret misappropriation claim.

### C.  <u>Irreparable Harm</u>

Lilith must provide "evidence and reasoned analysis" that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  <u>eBay</u>, 547 U.S. at 391. Alleged harm that is remote or speculative will not be considered irreparable; rather, the movant must demonstrate that the threatened harm is imminent.  <u>See Colorado River Indian Tribes v. Town of Parker</u>, 776 F.2d 846, 849–851 (9th Cir. 1985).

Lilith advances two theories to support its assertion that it will suffer irreparable harm in the absence of a preliminary injunction: damage to its reputation and its alleged inability to secure an exclusive distribution agreement in the United States.

**United States District Court**
For the Northern District of California

Loss of goodwill, as well as damage to reputation, can support a finding of irreparable harm.  See Rovio Entm't, Ltd. v. Royal Plush Toys, Inc., No. C 12-5543 SBA, 2012 U.S. Dist. LEXIS 169020, *29-33, (N.D. Cal. Nov. 27, 2012).  Lilith argues that it has suffered reputational damage because some users have posted comments on the internet accusing Lilith of copying Heroes Charge.  For the reasons set forth below, however, the Court is not convinced that anecdotal comments on the internet establish a likelihood of irreparable harm sufficient to justify extraordinary relief in the form of a preliminary injunction.

Lilith points to Rovio Entm't, Ltd. v. Royal Plus Toys, Inc.. Id.  In Rovio, the defendant was allegedly selling unauthorized knockoff plush toys that were inferior but nearly identical in appearance to the plaintiff's products in violation of its copyrights and trademarks.  Id. at *1.  The court held that the plaintiff suffered irreparable harm, in part, because (1) irreparable harm in trademark cases includes a loss of trade, (2) defendant's product threatened plaintiff's reputation because it posed a potential public health risk, and (3) the potential harm to plaintiff was significant given the "great energy, time and money" plaintiff had spent building its reputation.  Id. at *31-32.

Although Lilith's evidence suggests the possibility of some damage to its reputation, unlike the plaintiffs in Rovio, Lilith has not expended great energy, time, and money to build its reputation outside of Asia in the markets where its reputation has allegedly been damaged by uCool.  Indeed, Lilith is a relative newcomer to the United States, Europe, and other markets where Heroes Charge has been released.  Moreover, unlike in Rovio where

**United States District Court**
For the Northern District of California

1    the inferiority of the defendant's product was primarily

2    responsible for plaintiff's reputational damage, it does not appear

3    that Heroes Charge is necessarily inferior to Sword and Tower.

4    Thus, while there is the potential for confusion in the market

5    given the similarities between the games, the damage to Lilith's

6    reputation caused by this confusion is relatively small.  The

7    potential damage is even more limited given that the parties, as

8    stated during the hearing on this motion, are likely to go to trial

9    in only nine months' time.

10       Instead of facing irreparable harm to its reputation, Lilith

11   is primarily facing challenges to its ability to expand into new

12   markets.  Heroes Charge was released in the United States over a

13   year before Sword and Tower and has built up a significant base of

14   users after an aggressive marketing campaign.  Lilith cannot easily

15   penetrate this market given the popularity of Heroes Charge and the

16   fact that Sword and Tower is incredibly similar from a user's

17   perspective.  Although Lilith has been able to secure nonexclusive

18   distribution agreements for the release of Sword and Tower in the

19   United States, it is likely that it would have been able to secure

20   much better terms but for the presence of Heroes Charge in the

21   marketplace.  The difference in value between an exclusive and

22   nonexclusive distribution contract, however, does not constitute

23   irreparable harm given that it can be quantified and remedied

24   through monetary damages.

25       Because Lilith has failed to establish that it will suffer

26   imminent harm that cannot be remedied with monetary damages, the

27   Court finds for uCool on this factor.

28   ///

1    **D.**   **Balance of the Equities**

2        "In each case, courts 'must balance the competing claims of

3    injury and must consider the effect on each party of the granting

4    or withholding of the requested relief.'"   Winter, 555 U.S. at 24

5    (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)).   In

6    doing so, the court balances the injury faced by the applicant for

7    an injunction against the injury that would be sustained by the

8    defendant if relief were granted.   See American Motorcyclist Ass'n

9    v.Watt, 714 F.2d 962, 966-967 (9th Cir. 1983); Brooktree Corp. v.

10   Advanced Micro Devices, Inc., 705 F. Supp. 491, 497 (S.D. Cal.

11   1988).

12        Here, the balance of the equities tips in uCool's favor.   If

13   the Court were to grant Lilith's motion, uCool would be forced to

14   take down its most popular game, threatening uCool's viability as a

15   company.   See also Open Text, S.A. v. Box, Inc., 36 F. Supp. 3d

16   885, 910 (N.D. Cal. 2014) ("A preliminary injunction is a drastic

17   remedy and the hardship on a preliminarily enjoined party who is

18   required to withdraw its product from the market before trial can

19   be devastating.").   uCool would not only lose profits but would

20   continue to incur a significant amount of fixed costs associated

21   with Heroes Charge.   Further, the harm to uCool would likely be

22   irreparable.   Even if uCool was able reintroduce Heroes Charge

23   after trial, it would likely struggle to recapture its lost market

24   share.   Given the dynamic and fast-moving nature of the video game

25   industry, there is a good chance that once users are no longer able

26   to use Heroes Charge, they will simply move on to another game.   In

27   addition, if Heroes Charge was suddenly unavailable for play, uCool

28   ///

**United States District Court**
For the Northern District of California

1  would likely suffer from a significant loss of goodwill, making it

2  difficult to create trust with players in the future.

3       The equities are also affected by the eight months that passed

4  from when Lilith discovered the alleged copying to when it filed

5  for a preliminary injunction.  Lilith first learned of uCool's

6  allegedly unlawful copying in August 2014, at which point it

7  attempted to resolve the dispute by issuing a take-down notice.

8  The parties then exchanged correspondence through the end of

9  November 2014, when those talks stalled without any resolution.

10 Lilith then waited an additional four months before filing this

11 suit, during which time uCool invested millions of dollars in

12 Heroes Charge, including an ad that ran during the Super Bowl.

13 Lilith argues that the four-month delay was justified because it

14 was reluctant to become involved in costly litigation until it was

15 necessary.  Lilith claims filing suit was not necessary until March

16 2015 because the harm to its reputation and its inability to secure

17 exclusive distribution agreements did not become apparent until

18 March 2015.  These challenges were foreseeable given the similarity

19 between the games, but even assuming that Lilith was justified in

20 waiting, the delay still affects the equities in this case.  uCool

21 made huge investments during those four months that would likely be

22 lost if the Court were to grant a preliminary injunction.

23      In contrast, Lilith does not face significant irreparable harm

24 if an injunction is denied.  As discussed in the previous section,

25 if successful at trial (a mere nine months from now), Lilith could

26 recover significant monetary damages that would compensate it for

27 past harm.  At that point, it could also ask the Court to

28 permanently enjoin uCool from distributing Heroes Charge moving

United States District Court
For the Northern District of California

1  forward.

2      For these reasons, the Court finds that the balance of

3  equities tips in favor of uCool.

4      **E.   Public Interest**

5      If evidence of infringement is strong, then the public

6  interest favors its abatement given that the public has an interest

7  in seeing the copyright laws enforced.  See Flextronics Int'l, Ltd.

8  v. Parametric Tech., Corp., 2013 U.S. Dist. LEXIS 133403, *28 (N.D.

9  Cal. Sept. 16, 2013).  However, "[i]n the typical case, [this]

10 consideration adds little . . . [except where] the public interest

11 implicates separate issues."  5-14 Nimmer on Copyright § 14.06.

12     Here, evidence of infringement is strong, and therefore the

13 public interest tips towards granting the injunction.  However,

14 because there are no issues relating to the public interest

15 separate from Lilith's likelihood of success on the merits, the

16 public interest factor does not weigh heavily in the Court's

17 analysis.

18     **F.   Balancing the Factors**

19     Having assessed each factor individually, the Court -- using

20 its equitable discretion -- weighs the factors together to

21 determine whether an injunction should ultimately issue.  Judge

22 Posner of the Seventh Circuit aptly described the task at hand:

23     A district judge asked to decide whether to grant or deny
       a preliminary injunction must choose the course of action
24     that will minimize the costs of being mistaken.  Because
       he is forced to act on an incomplete record, the danger
25     of a mistake is substantial.  And a mistake can be
       costly.  If the judge grants the preliminary injunction
26     to a plaintiff who it later turns out is not entitled to
       any judicial relief -- whose legal rights have not been
27     violated -- the judge commits a mistake whose gravity is
       measured by the irreparable harm, if any, that the
28     injunction causes to the defendant while it is in effect.

**United States District Court**
For the Northern District of California

1  <u>Am. Hosp. Supply Corp. v. Hosp. Products Ltd.</u>, 780 F.2d 589, 593

2  (7th Cir. 1986).

3     Accordingly, the Court will only grant an injunction if the

4  irreparable harm to Lilith if the injunction is denied, multiplied

5  by Lilith's likelihood of success on the merits, exceeds the

6  irreparable harm to uCool if the injunction is granted, multiplied

7  by the likelihood that Lilith will not succeed on the merits.[11]

8  <u>See</u> <u>id.</u>; <u>see also</u> <u>Drakes Bay Oyster Co. v. Jewell</u>, 747 F.3d 1073,

9  1099 (9th Cir. 2014) (applying a similar test).   Although exact

10  figures cannot be calculated, this formula provides the analytical

11  framework within which the Court must make its decision.

12     This is a close case.   Lilith has demonstrated a strong

13  likelihood of success on the merits.   Indeed, prior to the Supreme

14  Court's decisions in <u>eBay</u> and <u>Winter</u>, such a showing would have

15  compelled the Court to grant the requested relief.   After

16  considering the remaining factors, however, the Court finds that

17  granting a preliminary injunction at this juncture would be

18  inappropriate.   Lilith has not shown a <u>likelihood</u> of irreparable

19  harm.   Further, because of the extent of the irreparable harm to

20  ///

21  ///

22  ///

23  ///

24  ///

---

25  [11] This framework can also be represented formulaically:  Grant

26  preliminary injunction if but only if $P * H_p > (1 - P) * H_d$, where $P =$

27  Lilith's probability of success on the merits, $H_p =$ the irreparable
harm to the plaintiff if the injunction is not granted, and $H_d =$
the irreparable harm to the defendant if the injunction is granted.

28  <u>Id.</u>

the defendant if the injunction is granted, the balance of equities tips decidedly in uCool's favor.

## V.  **CONCLUSION**

For the forgoing reasons, Lilith's motion for preliminary injunction is DENIED.  uCool's evidentiary objections are OVERRULED.

IT IS SO ORDERED.

Dated: September 23, 2015          

                                    UNITED STATES DISTRICT JUDGE